**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER  DIVISION**

| | | |
|---|---|---|
| **MARVIN LEE WILSON,** | § | |
| **Petitioner,** | § | |
| | § | |
| **vs.** | § | |
| | § | **No. 6:06cv140** |
| **NATHANIEL QUARTERMAN,  Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| **Respondent.** | | |

### MEMORANDUM OPINION

This matter comes before the Court on Petitioner Marvin Lee Wilson's ("Wilson") amended application for a writ of *habeas corpus* (Docket No. 11), filed on July 30, 2006.  The Court, having considered the circumstances alleged and authorities cited by the parties, as well as the record and the applicable law, finds that the application is not well-taken and it is **DENIED.**

### BACKGROUND

**Factual Background**[1]

On November 4, 1992, Officer Robert Roberts and other police officers entered Wilson's apartment pursuant to a search warrant.  Jerry Williams was the confidential informant whose information enabled Roberts to obtain the warrant.  Williams entered and left the apartment minutes before the police went in.  Wilson, Vincent Webb, and a juvenile female were present in the apartment.  Over 24 grams of cocaine were found, and Wilson and Webb were arrested for possession of a controlled substance.  Wilson was subsequently released on bond, but Webb

---

[1] The recitation of the factual background is taken from *Wilson v. State*, 7 S.W.3d 136, 139-40 (Tex. Crim. App. 1999).

1

remained in jail.  Sometime after the incident, Wilson told Terry Lewis that someone had "snitched" on him, that the "snitch" was never going to have the chance "to have someone else busted," and that he, Wilson, "was going to get him."

On November 9, 1992, several observers saw an incident take place in the parking lot in front of Mike's Grocery.  Vanessa Zeno and Denise Ware were together in the parking lot.  Caroline Robinson and her daughter Coretta Robinson were inside the store.  Julius Lavergne was outside the store, but came in at some point to relay information to Caroline.  The doors to Mike's Grocery were made of clear glass, and Coretta stood by the door and watched.  Zeno, Ware, Coretta, and Lavergne watched the events unfold while Caroline called the police. . .

In the parking lot Wilson stood over Williams and beat him. Wilson asked Williams, "What do you want to be a snitch for?  Do you know what we do to a snitch?  Do you want to die right here?"  In response, Williams begged for his life.  Andrew Lewis, Terry's husband, was pumping gasoline in his car at the time.  Williams ran away from Wilson and across the street into a field. Wilson pursued Williams and caught him.  Andrew drove the car to the field.  While Williams struggled against them, Wilson and Andrew forced Williams into the car.  At some point during this incident, either in front of Mike's Grocery, across the street, or at both places, Andrew participated in hitting Williams, and Wilson asked Andrew: "Where's the gun?"  Wilson told Andrew to get the gun and that he, Wilson, wanted to kill Williams.  They drove toward a Mobil refinery.  Zeno and Ware drove back to their apartments, which were close by, and when they arrived, they heard what sounded like gunshots from the direction of the Mobil plant.

Sometime after the incident, Wilson told his wife, in the presence of Terry Lewis and her husband, "Baby, you remember the nigger I told you I was going to get?  I did it.  I don't know if he

dead or what, but I left him to die." When Terry looked back at her husband, Wilson stated, "Don't be mad at Andrew because Andrew did not do it. I did it."

On November 10, 1992, a bus driver noticed Williams' dead body on the side of a road. The autopsy report concluded that Williams died from close range gunshot wounds to the head and neck.

Having known Wilson for 16 years, Zeno identified him. Lavergne and Coretta recognized Williams but did not know Wilson or Andrew. Lavergne subsequently identified Andrew in a photo line-up.

**Legal Background**

In April of 1994, Wilson was convicted of capital murder and sentenced to death, but his conviction was reversed by the Texas Court of Criminal Appeals. *Wilson v. State*, 938 S.W.2d 57 (Tex. Crim. App. 1997), *overruled on other grounds, Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002). In February of 1998, Wilson was retried and again convicted and sentenced to death; this time his conviction and sentence were affirmed. *Wilson v. State*, 7 S.W.3d 136 (Tex. Crim. App. 1998). In December of 1999, he filed a petition for post-conviction relief in state court, which was denied. *Ex Parte Wilson*, No. 46,928-01 (Tex. Crim. App. Oct. 11, 2000) (unpublished). Wilson then filed an application for a writ of *habeas corpus* in this Court, which was denied. *Wilson v. Cockrell*, No. 6-01cv186 (E.D. Tex. July 11, 2002) (unpublished). The United States Court of Appeals for the Fifth Circuit affirmed this Court's decision. *Wilson v. Cockrell*, 70 Fed. Appx. 219 (5th Cir. 2003) (unpublished.)

On June 20, 2002, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304, in which it held for the first time that it was unconstitutional to execute the mentally retarded. In *Atkins*, the Court reasoned that a national consensus had been reached against executing the mentally retarded

offenders and thus doing so is unconstitutional under the Eighth Amendment as an excessive punishment. *Id*. at 317, 321. According to the Court, this consensus reflects the widespread belief that the mentally retarded are less culpable for their crimes. *Id*. The Court also stated that the same cognitive and behavioral characteristics that make the mentally retarded less culpable also make them less likely to be deterred from crime by the death penalty. *Id*. at 320. Furthermore, the Court found that some characteristics of the mentally retarded undermine the procedural protections in capital cases, such as aiding in their own defense. *Id*. at 318, 320. The Court observed that the mentally retarded typically make poor witnesses and their demeanor may create an undeserved perception that they lack remorse. *Id*. at 321. The Court reasoned that these considerations increase the risk that the death penalty may be imposed despite factors that call for a less severe sentence. *Id*. at 320. Thus, the Court concluded that the mentally retarded face a special risk of wrongful execution. *Id*. at 321. The Court, however, left the task of appropriately enforcing the constitutional restriction against executing the mentally retarded to the states. *Id*.

In June of 2003, Wilson filed a second petition for post-conviction relief in state court, claiming that he was mentally retarded. After conducting an evidentiary hearing, the state court denied his petition. *Ex parte Wilson*, No. 46,928-02 (Nov. 10, 2004). Wilson then filed an application for a writ of *habeas corpus* in this Court, but it was dismissed because he had not obtained prior authorization from the United States Court of Appeals for the Fifth Circuit. After obtaining the Fifth Circuit's permission, Wilson filed a second federal application for a writ of *habeas corpus*, which contains this mental retardation claim.

## STANDARD OF REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"),

because Wilson's application for a writ of habeas corpus was filed on March 28, 2006, after the

AEDPA effective date of April 24, 1996. The AEDPA provides in relevant part:

> An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d). A state court determination that is objectively unreasonable meets the

requirements of section (d)(1). *See Woodford v. Visciotti*, 537 U.S. 19, 27 (2002). Pure questions

of law and mixed questions of law and fact are reviewed under section (d)(1), while pure questions

of fact are reviewed under section (d)(2). *See Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000),

*cert. denied*, 532 U.S. 949 (2001). Factual findings made by the state court must be adopted unless

rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

In *Atkins*, the Supreme Court specifically charged the states with defining mental retardation

in the capital punishment context. Because this case involves a conviction and sentence imposed

under state law, the Court applies the state law mental retardation definition in deciding Wilson's

application.

While the Texas Legislature has never enacted any guidelines for determining mental

retardation in the capital punishment context,[2] the Texas Court of Criminal Appeals set forth interim

---

[2] After *Atkins* was decided, the Texas Legislature failed to enact legislation carrying out the *Atkins* mandate. The Texas Court of Criminal Appeals was forced by the Legislature's inaction to provide the bench and bar with temporary judicial guidelines to address the swell of *Atkins* claims before the courts. *See Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004). The Legislature has not altered the guidelines in the five years since *Briseno* was decided.

guidelines in *Ex Parte Briseno,* 135 S.W.3d 1 (Tex. Crim. App. 2004). The *Briseno* court adopted mental retardation definitions used by the American Association of Mental Retardation ("AAMR")[3] and by the Texas Health and Safety Code. *Id*. at 8. Both are similar. Under the AAMR definition, mental retardation is characterized by three elements:

(1) "'significantly sub-average' general intellectual functioning" defined as "an IQ of about 70 or below (approximately two standard deviations below the mean)";

(2) "accompanied by 'related' limitations in adaptive functioning" defined as "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales";

(3) "the onset of which occurs prior to the age of 18."

*Id*. at 7 & nn.24-25 (citing AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORT 5 (9th ed. 1992) [hereafter AAMR 9th ed.]). Under the Texas Health and Safety Code definition "'mental retardation' means significantly sub-average general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period" where "'[a]daptive behavior' means the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group." TEX. HEALTH AND SAFETY CODE ANN. §591.003(13),(1).

Both definitions require significantly sub-average intellectual functioning with limited adaptive functioning and onset prior to adulthood.

---

[3] In July, 2006, the American Association on Mental Retardation changed its name to the American Association on Intellectual and Developmental Disabilities.

## ANALYSIS OF THE STATE COURT'S DECISION

### 1. Significantly subaverage general intellectual functioning

<u>A. Standard</u>

Whether Wilson suffers from significantly sub-average general intellectual functioning is a question of fact. *See Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006), *cert. denied,* 549 U.S. 1254 (2007). Accordingly, the question for the Court is whether the state court's decision on this issue was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Unreasonableness in this context must be established by rebutting the state court's factual finding by clear and convincing evidence. *Id.*

"Significantly subaverage general intellectual functioning is defined as an IQ of about 70 or below." *Briseno*, 135 S.W.3d at 7 n.24 (citing AAMR 9th ed. at 5). The American Psychiatric Association ("APA") recognizes four categories of mental retardation: mild, moderate, severe, and profound. *Id*. at 5 (citing APA, Diagnostic and Statistical Manual of Mental Disorders 41-42 (4th ed. 2000) [hereinafter DSM-IV]). Eighty-five percent of the mentally retarded population are mildly retarded. DSM-IV at 41. Individuals with IQ scores between about 55-70 are classified as mildly mentally retarded if they satisfy the adaptive-functioning and age-at-onset criteria. DSM-IV at 40.

A standardized IQ test's mean score is typically 100, with a standard deviation of 15; thus, a score of about 70 is approximately two standard deviations from the mean. *Id.* IQ tests typically have a five point standard error of measurement, which means that any score actually represents a score that could be five points higher or lower. Accordingly, a test score as high as 75 or as low as 65 may represent an IQ as low as 70. *See Briseno*, 135 S.W.3d at 14 n.53; DSM-IV at 39.

B. The state court findings:

The state trial court found:

> The defendant had IQ tests administered several times during his life. With the
> exception of his most recent score of 61, all of his scores were all (sic) above 70,
> considered the border below which a person is mildly mentally retarded . . . The only
> test on which the defendant scored lower than 70 was administered shortly before this
> hearing and Dr. Trahan's testing. Although in his report he notes that the test was
> administered by the highly respected Dr. Curt Willis, Dr. Trahan's testimony
> reflected it was actually administered by one of Dr. Wills' students. . .

The state court appeared to find Wilson's scores of 73 on an IQ test at age 13, 75 on an IQ test at age

28, and 75 and 79 on IQ tests administered by his own expert witness after his post-conviction

proceedings had commenced, more indicative of his general intellectual functioning than the fact that

Wilson had scored 61 on a third IQ test also administered after his post-conviction proceedings had

commenced. Wilson points out that his 61 score was on the Wechsler Adult Intelligence Scale,

Third Edition ("WAIS-III"), which is considered the most accurate test instrument, and the other

scores were obtained on less accurate tests. He also points out that the prosecution did not offer any

expert testimony, whereas his expert witness testified that after conducting several additional tests,

in his opinion Wilson did meet the criteria for a diagnosis of mild mental retardation. In its findings

of fact, the state court seems to discount the WAIS-III score because it was actually administered by

an intern and because no notes were provided showing whether the intern observed whether Wilson

might have malingered when he took that test.

C. Analysis:

Considering the narrow range of Wilson's scores on the other four tests (73, 75, 75 and 79),

that the average of those tests was above 75, that these scores were consistent over a span of more

than 30 years, and that they were obtained on four different types of IQ tests, the Court finds that

Wilson's evidence does not clearly and convincingly rebut the state court's implicit findings that Wilson's IQ was above "about 70 or below," and that his general intellectual functioning was not significantly below average.

## 2. Related limitations in adaptive functioning

### A. Standard

Related limitations in adaptive functioning are "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales" that are related to the individual's cognitive deficiencies. *Briseno*, 135 S.W.3d at 7 & n.25 (citing AAMR 9th ed. at 5). The AAMR sets forth three adaptive-behavior areas applicable to determining mental retardation: conceptual skills, social skills, and practical skills. AAMR, Mental Retardation: Definition, Classification, and Systems of Support 73 (10th ed. 2002)[hereinafter AAMR 10th ed.]. Conceptual skills include skills related to language, reading and writing, money concepts, and self-direction. *Id.* at 82. Social skills include skills related to interpersonal relationships, responsibility, self-esteem, gullibility, naivete, following rules, obeying laws, and avoiding victimization. *Id*. Practical skills include skills related to personal daily living activities such as preparing meals, taking medications, using the telephone, managing money, using transportation, and housekeeping activities; occupational skills; and maintaining a safe environment. *Id.*

According to the AAMR, limitations in adaptive behavior can and should be determined by using standardized tests that are normed on the general population, which includes people with and without mental retardation. *Id*. at 83. A "significant" limitation is established by a score of two

standard deviations below the mean in one of the three adaptive-behavior skill areas. *Id.* at 78.

There are many respected standardized measures that are commonly used, including the Vineland Adaptive Behavior Scales, the AAMR Adaptive Behavior Scales (ABS), the Scales of Independent Behavior, the Comprehensive Test of Adaptive Behavior-Revised, and the Adaptive Behavior Assessment system. *Id.* at 88-90. Typically, these measures require the clinician to interview a parent, teacher, or direct-service provider of the individual being assessed. *Id.* at 85. The interviewees should be well-acquainted with the individual's behavior over an extended period of time and in multiple settings. *Id.* Observations, interviews, and other assessment methods gather information about adaptive behavior and may complement standard measures but ordinarily should not replace them. *Id.* at 84.

However, diagnosing mental retardation will often require applying clinical judgment if earlier information is lacking or incomplete, if the individual's adaptive behavior cannot be assessed using standardized scales in his current environment, or if determining whether the onset was prior to age eighteen in an adult. *Id.* at 94. Clinical judgment is based on training, experience with others who are mentally retarded, and familiarity with the individual and his environment. *Id.* at 95.

Of particular importance in the capital punishment context is whether the defendant's adaptive limitations are truly related to his subaverage intellectual functioning or instead related to a condition which does not render him less culpable for his actions, such as a personality disorder. Comparing the testimony of the parties' experts regarding the defendant's adaptive deficits, the *Briseno* court noted:

> The defense expert sees the glass half-empty, [and] the State's expert sees the glass half-full. Both experts relied upon the same evidence and objective data to support their conclusions, yet the defense expert diagnosed mental retardation while the

State's expert found no mental retardation but did find evidence consistent with antisocial personality disorder.[4]

*Id.* at 13. The court then suggested a way for courts to distinguish between adaptive deficits which are related to subaverage intellectual functioning and deficits which are related to personality disorders:

> The adaptive behavior criteria are exceedingly subjective, and undoubtedly experts will be found to offer opinions on both sides of the issue in most cases. There are, however, some evidentiary factors which fact-finders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder:
>
> Did those who knew the offender during the developmental stage - his family, friends, teachers, employers, authorities - think he was mentally retarded at that time, and, if so, act in accordance with that determination?
>
> Has the person formulated plans and carried them through or is his conduct impulsive?
>
> Does his conduct show leadership or does it show that he is led around by others?
>
> Is his conduct in response to external stimuli rational and appropriate, regardless of

---

[4] The DSM-IV criteria for Anti-Social Personality Disorder are:

failure to conform to social norms with respect to lawful behaviors as indicated
by repeatedly performing acts that are grounds for arrest;
deceitfulness, as indicated by repeated lying, use of aliases, or conning others for
personal profit or pleasure;
impulsivity or failure to plan ahead;
irritability and aggressiveness, as indicated by repeated physical fights or
assaults;
reckless disregard for safety of self or others;
consistent irresponsibility, as indicated by repeated failure to sustain consistent
work behavior or honor financial obligations;
lack of remorse, as indicated by being indifferent to or rationalizing having hurt,
mistreated, or stolen from another.

DSM-IV 649-50 (1994). Antisocial Personality Disorder is a pervasive pattern of disregard for
and violation of the rights of others occurring since the age 15 years, as indicated by three or more
of the criteria. *Id.* Because of the overlap of diagnostic criteria for both Mental Retardation and
Antisocial Personality Disorder, equally qualified experts may rationally reach contrary opinions
based upon the same data. *Compare* DSM-IV 39-44 *with id.* 649-50.

*Briseno*, 135 S.W.3d at 13 n.52.

whether it is socially acceptable?

Does he respond coherently, rationally, and on point to oral and written questions or do his responses wander from subject to subject?

Can the person hide facts or lie effectively in his own or others' interests?

Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseno*, 135 S.W.3d at 8-9.

B. The state court findings:

The state court did not make explicit findings and reached no explicit conclusion as to whether Wilson had significant limitations in adaptive functioning. It did, however, make explicit findings as to each of the seven *Briseno* factors, finding that there was no evidence that those closest to Wilson during his developmental stage believed he was mentally retarded; that there was no evidence that Wilson acted impulsively, and that he did in fact formulate plans and carried them through; that there was no evidence that Wilson was ever considered a follower; that Wilson's conduct was rational and appropriate, although often illegal; in most instances, that Wilson's responses to oral and/or written questions were coherent, rational and on point; that Wilson was capable of lying and hiding facts when he felt it was in his best interest; and, that the crime at issue showed deliberate forethought, planning, and execution of purpose.

Based on these findings, the trial court appears to have determined either that Wilson did not have significant deficits in adaptive functioning or that whatever adaptive limitations Wilson may have are not related to subaverage intellectual functioning, but are rather related to a personality disorder.

C. Analysis:

Wilson contends that the state court's use of the *Briseno* evidentiary factors was an unreasonable application of the federal law as clearly established by the Supreme Court of the United States in *Atkins v. Virginia*. As he correctly points out, in *Briseno* the evidentiary factors had a fairly limited role: they were used to resolve conflicting expert testimony about whether certain adaptive deficits were the result of actual sub-average intellectual functioning or instead the product of a personality disorder. In the present case, however, the state court relied on the *Briseno* factors alone, rather than as a supplement to clinical factors, in determining whether he had related, significant deficits in adaptive functioning.

Wilson presented evidence of significant limitations in all three areas of adaptive functioning: the conceptual domain, the social domain, and the practical domain. For example, his expert witness, Dr. Trahan, testified that Wilson's composite score of 44 on the Vineland Adaptive Behavior Skill Test was well within retarded range, and Wilson presented affidavits from friends and family members attesting to his difficulties in written communication and understanding money management concepts, his inability to get along with others and avoid being victimized, and his problems with personal hygiene and maintaining employment.

The state presented no evidence that Wilson's deficits in adaptive functioning were the result of a personality disorder or that he suffered from a personality disorder at all. Rather, the state trial court's findings appear based on the view that the *Briseno* factors can be used by themselves to establish whether a person has significant deficits in adaptive functioning, even if evidence is submitted which is relevant to the AAMR definition of adaptive deficits. The Texas Court of Criminal Appeals used a similar analysis in at least one case, albeit in an unpublished opinion. *See*

*Ex parte Chester*, No. 75,037-02, 2007 WL 60207 at *3-5 (Tex. Crim. App. Feb. 28, 2007).

Accordingly, the Court cannot say that the state court's implicit finding in the present case - that Wilson did not have significant deficits in adaptive functioning - is unreasonable in light of the evidence presented in his state post-conviction proceedings.[5]

Wilson also contends that the state court's broad application of the *Briseno* evidentiary factors was unreasonable because the affirmative findings as to those factors do not necessarily mean that a person is not mentally retarded. For example, while the state court found that Wilson's crime showed deliberate forethought, planning, and execution of purpose, Wilson contends that the facts of the crime show deliberate forethought, planning, and execution of purpose "in only the simplest sense." He argues that the cognitive abilities he displayed in figuring out that the victim, Jerry Williams, had snitched on him, and then, after telling the wife of his accomplice that he was going to permanently silence the snitch, trapping Williams in a grocery store parking lot, abducting him at gunpoint with the help of the accomplice, and taking him to a secluded area and shooting him were "not inconsistent with mental retardation."

Wilson's argument appears to be that the final *Briseno* evidentiary factor is invalid unless it is interpreted as recognizing that mentally retarded individuals are in fact capable of formulating and executing rudimentary plans, but not complex ones, and his plan in the present case was

---

[5] Similarly, in at least one federal court opinion, an affirmative finding as to the final *Briseno* evidentiary factor has been considered sufficient by itself to deny relief in *habeas corpus*. *See e.g. Moreno v. Dretke,* 362 F. Supp. 2d 773, 792 (W.D. Tex. 2005), *affirmed,* 450 F.2d 158 (5th Cir. 2006), *cert. denied,* 549 U.S. 1120 (2007):

> Given . . . petitioner's demonstrated capabilities to engage in the planning and execution of complex schemes . . .[the state] court's rejection on the merits of petitioner's *Atkins* claim was neither an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in petitioner's second state habeas proceeding.

insufficiently complex to establish that factor.  The problem with his argument is that 28 U.S.C. §

2254(e)(1) requires the Court to defer to the state court's factual findings unless those findings are

rebutted by clear and convincing evidence.  Wilson's conclusory characterization of his plan does

not clearly and convincingly rebut the state court's factual finding.

The Court therefore finds that the state court's implicit finding -  that Wilson failed to

establish that he had related, significant deficits in adaptive functioning -  was neither contrary to,

nor the result of an unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States in *Atkins*, and it was not unreasonable in light of the evidence

presented in his state post-conviction proceedings.

**3. Onset before age eighteen**

A. Standard

In order to be assessed as mentally retarded, significantly subaverage intellectual functioning

and related adaptive deficits must manifest before the individual is eighteen.  *Briseno,* 135 S.W.3d

at 7.  If they manifest after age eighteen, the individual can be diagnosed with dementia, but not with

mental retardation.  *See Tennard v. Dretke*, 542 U.S. 274, 280 (2004).

B. The state court findings:

The state court found:

As noted previously, all of the testimony, affidavits, reports and other forms of
evidence reflect that the defendant functioned sufficiently in his younger years to
hold jobs, get a driver's license, marry and have a child.  Although he did poorly in
school, the record reflects that he seldom went to class.  He was considered slow by
most, yet **there is nothing in the record to reflect that anyone diagnosed or
considered the defendant mentally retarded prior to his becoming 18 years old.**

(emphasis in original).

C. Analysis:

Because the state court implicitly found that Wilson's general intellectual functioning was not significantly subaverage, and because it also implicitly found that he did not have related, significant deficits in adaptive functioning, its implicit finding that these deficits did not manifest before age eighteen was not objectively unreasonable. *See Woods v. Quarterman*, 493 F.3d 580, 587 (5th Cir. 2007).

**CONCLUSION**

Under Texas law, to establish mental retardation, a defendant must prove significantly subaverage general intellectual functioning, related limitations in adaptive functioning, and onset before age eighteen. The state court's determination that Wilson does not have significant subaverage intellectual functioning was not unreasonable. This alone is a sufficient ground to deny Wilson's application. Furthermore, the state court's determination that Wilson did not have related adaptive functioning deficits was not an unreasonable application of the law or unreasonable in light of the evidence. Finally, in light of these determinations, the state court's implicit finding that significant subaverage intellectual functioning with related limitations in adaptive functioning did not occur before age eighteen was not unreasonable. Accordingly, for the above reasons the Court **DENIES** Wilson's application for a writ of *habeas corpus*. A Judgment for the Director will be entered.

**So ORDERED and SIGNED this 31st day of March, 2009.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**